OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio.  Attention:  Walter S. Kobalka, Reporter, or Deborah J. Barrett, Administrative Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.  Your comments on this pilot project are also welcome.

NOTE:  Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public.  The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions.  The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Webb, Appellant.
[Cite as State v. Webb (1994),      Ohio St.3d      .]
Criminal law -- Rule changing quantum of proof required for
     conviction may be applied to trials of crimes committed
     before the rule was announced -- Prosecutor's offer to
     plea bargain in a capital case is not a mitigating factor
     for purposes of R.C. 2929.04(B)(7) or the Eighth Amendment
     -- Aggravated murder -- Death penalty upheld, when.
1. A rule changing the quantum of proof required for conviction
     may be applied to trials of crimes committed before the
     rule was announced without violating the Ex Post Facto
     Clause.  (State v. Jones [1981], 67 Ohio St.2d 244, 21
     O.O.3d 152, 423 N.E.2d 447, overruled.)
2. A prosecutor's offer to plea bargain in a capital case is not
     a mitigating factor for purposes of either R.C.
     2929.04(B)(7) or the Eighth Amendment.  (State v. Sneed
     [1992], 63 Ohio St. 3d 3, 584 N.E.2d 1160, approved and
     followed.)
     (No. 93-1374 -- Submitted April 19, 1994 -- Decided
September 21, 1994.)
     Appeal from the Court of Appeals for Clermont County, No.
CA91-08-053.
     On November 21, 1990, three-year-old Michael Patrick
("Mikey") Webb was killed in a fire at his home.  Mikey's
father, defendant-appellant Michael D. Webb, was convicted of
Mikey's aggravated murder and was sentenced to death.
     Webb lived in Goshen Township, Clermont County, with his
wife Susan, his sons Charlie and Mikey, and the teenaged
daughters of his first marriage, Tami and Amy.  In 1978, Webb's
first wife Linda and her mother died in a traffic accident; Amy
was badly injured.  Amy and Tami received a total settlement of
$42,667,33 for personal injury and wrongful death, plus at
least $7,567.42 from their grandmother's estate.  The probate
court appointed Webb guardian of Tami's and Amy's estate.  In
1982, Webb invested the estate funds in a twenty-six-week
certificate of deposit ("CD"), face value $51,800, renewing it
regularly until 1985.
     From 1985 to 1988, Webb appropriated most of the estate

funds for his personal use.  He would redeem his daughters' CD, purchase another with a lower value, and retain the balance of the funds.  Webb did this seven times between 1985 and 1988. Each time he bought a new CD, Webb instructed the bank to deposit the interest in his checking account.  His authorization to spend guardianship funds had expired on July 1, 1984.

After July 1983, Webb neglected to file an account with the probate court.  In February 1987, Webb came into court after receiving a notice ordering him to file an account or be removed as guardian.  Webb told the probate judge "that he had spent the money" and knew he had to replace it.

In 1987, Linda Webb's father died, leaving $51,059.66 to Tami and Amy.  Webb did not report these funds to the probate court as being part of the guardianship.  He bought a one-year CD in his daughters' names, face value $50,000, with this money.  On January 18, 1989, Webb redeemed the CD, receiving $51,825.73, and bought a new CD with a face value of $50,300. About a month later, he redeemed that CD prematurely, receiving $48,522.29.  He used $35,000 to open a savings account in his own name, keeping the balance.

In 1990, Webb met Nadine Puckett.  Their friendship quickly blossomed.  On October 31, 1990, Nadine's ex-husband found them together.  The next morning, Nadine went to stay with her sister in Dayton.  Between November 1 and November 20, Webb made several trips to Dayton to see Nadine, and phone company records showed frequent calls from Webb's phone to Nadine's sister's house.  During this period, Webb told Nadine he planned to leave Susan.

James Pursifull worked for Webb's bodyshop until quitting on October 23, 1990.  Webb told people that he had fired Pursifull and accused Pursifull of threatening and harassing him.  Webb later requested Pursifull to help with some work at his house because Webb "had to go in the hospital to get his colon removed"; Pursifull never came to appellant's home.  The prosecution later argued that Webb had been trying to "set [Pursifull] up" by getting him to leave fingerprints at Webb's residence.

On the evening of November 20, 1990, Tami Webb locked the door leading outside from the basement (where she and Amy had their bedrooms) and went to bed.  Early the next morning, Tami was awakened by cold air and the smell of gasoline.  Webb came into her room.  A frightened Tami told him she smelled gasoline.  Webb said that he did too, and that he thought the house was "rigged."  He ordered Tami to "get down" or "lie down" and to "get Amy."  He never told her to get out of the house.  Webb then went upstairs.  Tami, too frightened to leave her bed, pulled the covers up and closed her eyes.  She later testified that, when she opened them, she saw a man in a red sweatshirt staring at her.  However, she conceded on cross-examination that her "feeling" that "someone else was in the house" was "based upon the fact that [she] could not believe" her father set the fire.

After that, Amy heard an explosion upstairs.  Tami yelled at Amy to get out of the house, and they both ran out through the basement door and around to the front of the house, where they saw Webb.  Webb's hands were bloody.  It was later discovered that he got out by breaking through the bathroom

window.  A firefighter rescued Charlie and Susan from the master bedroom.  Mikey died of smoke inhalation.

Township Fire Chief Virgil E. Murphy investigated the fire scene.  In the foyer, he found a plastic gasoline can that had come from Webb's garage.

A "very definite po[u]r pattern or trailer" was noted in the foyer.  Murphy followed the trailer down a hallway leading to the bathroom and bedrooms.  From the hallway, the trailer led into the master bedroom up to the base of the bed. (Charlie's crib stood next to that bed.)  The trailer also went into Mikey's room "up the side of the bed and across the bed to the rear wall."  Arson investigators took samples from the trailers for analysis.  The samples contained gasoline.

After examining the house, Murphy concluded that the fire was caused by arson and had started in two places.  One fire was contained in the hall closet.  A second had started at the bathroom door, at the end of the hallway nearest the bedrooms, and moved from there into the bedrooms and down the hallway toward the living room.

An unignited gasoline trailer led downstairs to the basement, where Murphy found a two-liter pop bottle containing gasoline; the bottle had Webb's fingerprints on it.  Gasoline had also been poured on Tami's bed, and Murphy smelled it on Amy's bedclothes.  Murphy concluded: "If all the trailers * * * had ignited the chances of anybody escaping from that home [were] very, very slim."

Police found bloodstains matching Webb's blood type on the bathroom windowsill and basement door.  The bathroom window had been broken from the inside.  Blood trails on the ground led away from the window.  A matchbook found outside bore a partial fingerprint in blood; Webb later admitted to police the print was his.  Moreover, Webb had a peculiar way of holding a matchbook when he lit matches, and the print's location indicated that Webb had put it there while lighting a match.

On the morning of November 21, Webb told one of Susan's brothers that a fire bomb had been thrown through the bathroom window.  Subsequently, he told Amy, Tami, and Susan's brother Larry Beck that he had broken the bathroom window to get out. He also told Amy that, when the explosion occurred, he was going into the master bedroom to get Susan, and the explosion had thrown him into the bathroom.

Webb was indicted on two counts of aggravated murder, R.C. 2903.01.  Each count bore a felony-murder specification, R.C. 2929.04(A)(7), and a course-of-conduct specification, R.C. 2929.04(A)(5).  Webb was also indicted on four counts of attempted aggravated murder, one count of aggravated arson under R.C. 2909.02(A)(2), five counts of aggravated arson under R.C. 2909.02(A)(1), and one count of aggravated theft.

The jury convicted Webb on all counts and, after a mitigation hearing, recommended death for the aggravated murder of Mikey Webb.  The trial court sentenced Webb to death.  The court of appeals affirmed.


Donald W. White, Clermont County Prosecuting Attorney, and David Henry Hoffmann, Assistant Prosecuting Attorney, for appellee.

H. Fred Hoefle and Kenneth J. Koenig, for appellant.

Alice Robie Resnick, J.   In this appeal, Webb advances twenty-six propositions of law.  Finding none meritorious, we affirm his convictions.  We have also independently balanced the aggravating circumstances against mitigating factors, and compared the sentence to those imposed in similar cases, as R.C. 2929.05(A) requires.  As a result, we affirm the sentence of death.

## I. Prosecutorial Misconduct

In his first proposition of law, Webb claims that the prosecutor repeatedly commented in closing argument on Webb's refusal to testify, violating his Fifth Amendment rights.  See Griffin v. California (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. We find that the comments complained of did not violate Griffin.

In closing argument, the prosecutor said that Webb "killed his son" and "tried to kill every single person in his house." Webb interrupted the prosecutor, saying: "You're wrong."  The prosecutor said: "He spoke."  Webb claims that the words "He spoke" were an implied comment on the fact that Webb had not testified at trial.

We cannot agree.  The prosecutor's remark, on its face, dealt with what Webb said, not what he did not say.  The question is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." (Emphasis added.)   Knowles v. United States (C.A.10, 1955), 224 F.2d 168, 170, quoted in State v. Cooper (1977), 52 Ohio St.2d 163, 173, 6 O.O. 3d 377, 382, 370 N.E.2d 725, 733.  From the record, we cannot conclude that the jury would naturally or necessarily interpret the words "He spoke" as a comment on Webb's failure to speak.

Webb construes many other remarks as comments on his failure to testify.  Discussing Pursifull's testimony, the prosecutor said: "You will see in [Webb's] hospital records * * * he was in good health before the fire. * * *  This is uncontradicted."  The defense objected.  The prosecutor added: "Pursifal's [sic] comments are unrebutted that the defendant told him he had the serious colon cancer * * *."  The defense did not object, and thus waived any error with respect to this comment.

A prosecutor generally may note that his or her evidence is uncontradicted unless it is evidence only the defendant could contradict.  See Annotation (1967), 14 A.L.R.3d 723, 730-743.  The "uncontradicted" medical records were not evidence that only Webb could contradict; he could have called his doctor to rebut them.  Thus, "the comment [was] directed to the strength of the state's evidence and not to the silence of the accused * * *."  State v. Ferguson (1983), 5 Ohio St.3d 160, 163, 5 OBR 380, 383, 450 N.E.2d 265, 268.

The prosecutor repeatedly said that Webb had not explained what happened to the money he took from the guardianship account, and Webb contends these remarks violated Griffin as well.  However, the context shows that these comments dealt not with Webb's failure to testify, but with Webb's failure to explain to the probate court and to his own family what he did with the money.  We overrule Webb's first proposition of law.

In his second proposition of law, Webb contends that the prosecutor provoked him into interrupting the prosecutor's argument, then used the interruption as an excuse to comment on Webb's failure to testify. According to Webb, on the day closing arguments took place, the prosecutor told him during a recess that "he can't believe they [the defense] would stoop low enough to blame his daughters." Webb claims this incident somehow provoked his outburst during the prosecutor's summation, two hours later. Even if we accept this speculation as fact, this proposition of law stands or falls with Webb's earlier claim that the prosecutor's response to that outburst was a comment on Webb's silence. Rejecting that claim, we also reject Webb's second proposition.

In his fourth, fifth, and sixth propositions, Webb contends that the prosecutor argued "nonstatutory aggravating circumstances" in the penalty phase. Specifically, Webb objects because the prosecutor's argument emphasized the horror of Mikey's death by fire. As he did not object at trial, this claim is waived. State v. Williams (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

## II. Evidentiary Sufficiency

Webb claims his convictions are not supported by legally sufficient evidence. In his twenty-second and twenty-third propositions, he contends that, in assessing evidentiary sufficiency, we are bound by State v. Kulig (1974), 37 Ohio St.2d 157, 66 O.O.2d 351, 309 N.E.2d 897, syllabus: "Circumstantial evidence relied upon to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt."

In State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraphs one and two of the syllabus, we overruled Kulig and held that evidence, whether circumstantial or direct, is sufficient if a rational factfinder could find the crime's essential elements proven beyond a reasonable doubt. However, we announced that rule more than eight months after Mikey's murder. Hence, Webb claims, applying Jenks here would violate the constitutional prohibition of ex post facto laws.1

State v. Jones (1981), 67 Ohio St.2d 244, 21 O.O.3d 152, 423 N.E.2d 447, supports Webb's contention. Jenks arguably decreased the quantum of proof necessary for conviction, see 61 Ohio St.3d at 272-273, 574 N.E.2d at 503, fn. 5, and Jones held that no such change could be retroactively applied.

Jones involved a statute giving the defense the burden of persuasion as to affirmative defenses, where before it had had only the burden of going forward; thus, the new statute "decrease[d] the quantum of proof required for criminal conviction." 67 Ohio St.2d at 249, 21 O.O.3d at 155, 423 N.E.2d at 450. We noted that Calder v. Bull (1798), 3 U.S. (3 Dall.) 386, 1 L.Ed. 648, had defined, "ex post facto laws" to include "'[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.' (Emphasis sic.)" Jones, 67 Ohio St.2d at 248, 21 O.O.3d at 155, 423 N.E.2d at 449, quoting Calder, 3 U.S. at 390, 1 L.Ed. at 650. By imposing a new burden on defendants, the statute allowed conviction on less

testimony than required at the time of the offense; it was thus ex post facto as to crimes committed before it took effect.

However, Jones is fatally undercut by Collins v. Youngblood (1990), 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30. Citing Beazell v. Ohio (1925), 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216, Collins summarized the Ex Post Facto Clause as follows: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." 497 U.S. at 43, 110 S.Ct. at 2719, 111 L.Ed.2d at 39. Collins specifically noted that "[t]he Beazell definition omits the reference * * * to alterations in the 'legal rules of evidence.' * * * [T]his language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes." Collins, 497 U.S. at 43, 110 S.Ct. at 2719, 111 L.Ed.2d at 39, fn. 3.

Retroactive application of Jenks "does not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission; nor deprive one charged with crime of any defense available according to law at the time when the act was committed." Collins, 497 U.S. at 52, 110 S.Ct. at 2724, 111 L.Ed.2d at 45. Jenks changed only the "evidentiary standard," Jones, 67 Ohio St.2d at 248, 21 O.O.3d at 155, 423 N.E.2d at 449, and Collins establishes that new evidentiary rules may be applied retroactively. Therefore, a rule changing the quantum of proof required for conviction may be applied to trials of crimes committed before the rule was announced, without violating the Ex Post Facto Clause. To the extent Jones holds the contrary, we overrule it.

We also reject Webb's argument under Section 28, Article II of the Ohio Constitution, which denies the General Assembly power to make "retroactive laws." That provision speaks only of the General Assembly; it does not apply to judicially created rules. A decision of this court overruling a former decision "is retrospective in its operation, and the effect is not that the former [decision] was bad law, but that it never was the law." Peerless Elec. Co. v. Bowers (1955), 164 Ohio St. 209, 210, 57 O.O. 411, 129 N.E.2d 467, 468. Thus, we overrule Webb's twenty-second and twenty-third propositions of law and apply Jenks to his twenty-fifth proposition, which presents his insufficient-evidence claim.

As to that claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; accord Jenks, supra.

Webb argues that someone else could have set the fire. But Fire Chief Murphy found a two-liter pop bottle, one-third full of gasoline, in the basement. The bottle had Webb's fingerprints on it. There is no plausible innocent reason for Webb's fingerprints to be on a bottle of gasoline in a house that had just been set afire with gasoline.

Moreover, the jury could reasonably reject any theory involving an intruder. All doors had been locked. The front door was still locked when firefighters arrived. Investigators found no signs that the other doors had been forced. Moreover,

Larry Beck, Webb's brother-in-law and next-door neighbor, had an alert dog who usually "barks if there's a noise outside." Beck's dog did not bark on the morning of the fire, a fact remarkable enough for Beck to mention to police. (Although Beck later downplayed the dog's alertness, we must view the evidence in the light most favorable to the state.)

The evidence shows that Webb had domestic, financial, personal and other motives to have his wife and children dead. He was aware that the lives of Susan and the children were insured.

Webb lied to Amy about his actions during the fire. He told her that he was "going to get Susan" and was reaching for the master bedroom's doorknob when the explosion propelled him into the bathroom. That could be true only if the fire had moved toward the bathroom. But according to Fire Chief Murphy, the fire started at the bathroom door and moved toward the foyer and living room at the hallway's other end. Moreover, to open the bedroom door, Webb would have had to stand in the path of the flaming gasoline trailer, which extended into the bathroom and master bedroom. In that case, Webb and his clothing would have been burned. Yet his shirt, which the state produced at trial, was not burned at all.

A matchbook was found in the toilet, further supporting the state's theory that the fire started at the bathroom door. That matchbook bore the logo of a Tennessee motel where the Webbs had vacationed earlier that month. The matchbook found outside bore the same logo. It also bore Webb's bloody fingerprint, and the print's location indicated that Webb had been lighting a match.

Webb lied to his brother-in-law, telling him a firebomb had been thrown through the bathroom window. Webb knew better; by his own admission, he was near the bathroom when the fire started and broke the window himself.

To sum up: physical evidence linked Webb to the gasoline, the matches, and the fire's point of origin. He had strong motives to kill. He lied to his family about the fire. A reasonable trier of fact, viewing the evidence in the light most favorable to the state, could have found him guilty.

Webb contends that the state failed to prove intent to kill Susan, Tami, Amy, or Charlie. We disagree. The trailer on the first floor led into the master bedroom up to the foot of Susan's bed, which was right next to Charlie's crib. Gasoline was found on Tami's bed, and Chief Murphy smelled it on Amy's bedclothes. That is sufficient to show intent to kill.

Webb contends that no aggravated theft occurred, because Tami and Amy "consented" to his defalcations. But they told the jury they were unaware Webb was taking their money.2 In any case, it was the probate court's consent Webb needed; his daughters, minor children under guardianship, could not validly consent.

Webb further argues that the state did not prove he stole over $100,000, the amount required for aggravated theft. We disagree. The record shows that, from 1985 to 1988, Webb pocketed approximately $48,000 by redeeming CDs belonging to his daughters. He also ordered that the interest on the CDs be paid into his checking account; this amounted to nearly $11,700. (For some reason, the state includes only about half

this amount, $5,800.)  In 1989, Webb stole approximately $50,000 by redeeming CDs belonging to his daughters.  He also incurred well over $5,000 in penalties by prematurely redeeming CDs.  The premature redemptions facilitated Webb's stealing and deprived his daughters of additional money.  We consider the resulting penalties part of "the value of the property * * * stolen," R.C. 2913.02(B), pushing the total to over $115,000. Webb's twenty-fifth proposition is overruled.

### III. Opinion Testimony

In his third proposition of law, Webb complains that two police officers improperly gave opinion testimony.

Sergeant William Johnson was asked: "Now, between you and Chief Sn[y]der * * * following up on what you obtained from both investigation of the fire * * * and from other persons did you later draw a conclusion with regard to Mr. Pursifal's [sic] involvement?"  Johnson said he had concluded Pursifull "had no involvement whatsoever * * * ."  A timely objection was overruled.

Johnson's opinion was inadmissible.  Evid.R. 701 limits lay opinion testimony to "opinions and inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."  Johnson's opinion was not based wholly on his perceptions, but at least partly on information from Snyder, Pursifull, and others.

However, this error is harmless beyond a reasonable doubt.  See Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705.  The record contains no evidence to implicate Pursifull.  (Witnesses did testify that Webb had accused Pursifull of threatening him, but Webb's out-of-court assertions to that effect could not be used to prove the truth of the matters asserted and were not introduced for that purpose.)

Police Chief Ray Snyder testified that he searched Pursifull's car and found nothing "relevant to the crime committed earlier that morning[.]"  This opinion was admissible.  It was based on Snyder's own perceptions, and it was "helpful" because he would otherwise have had to explain, item by item, why each item in the car was not relevant.  It was "'not practicable to place before the jury all the primary facts'" on which Snyder based his opinion.  Staff Note to Evid.R. 701, quoting Baltimore & Ohio R. R. Co. v. Schultz (1885), 43 Ohio St. 270, 282, 1 N.E. 324, 332; Jacobs, Ohio Evidence:  Objections and Responses (1989) 157, Section 701. We overrule Webb's third proposition.

### IV. Hospital Records

Webb was hospitalized after the fire.  At trial, the state introduced Webb's hospital records to show that his injuries disproved his statements about where he was when the fire started, and to show that Webb had lied about his health to Jim Pursifull in order to "set [him] up," indicating prior calculation and design.  In his fifteenth proposition of law, Webb contends that the use of his hospital records violated R.C. 2317.02(B), the doctor-patient privilege statute.  The court of appeals held the records inadmissible but found harmless error.  We agree with both conclusions.

R.C. 2317.02(B)(1) provides that a physician may not

testify "concerning a communication made to him by his patient in that relation * * *."  R.C. 2317.02(B)(3) broadly defines "communication" to include "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician * * * to diagnose, treat, prescribe, or act for a patient.  A 'communication' may include, but is not limited to, any * * * hospital communication such as a record * * * ."  Thus, information placed in hospital records by a physician is privileged.3

However, error involving privilege is not a constitutional violation.  In the first place, the privilege is not a requirement of due process.  Privileges do not make trials more fair; they neither "facilitate the fact-finding process" nor "safeguard its integrity."  1 McCormick on Evidence (4 Ed.1992) 269, Section 72.  Rather, they protect "principle[s] or relationship[s] * * * that society deems worthy of preserving and fostering," even at some cost to the court's truth-finding function.  Lily, Introduction to the Law of Evidence (2 Ed. 1987) 381, Section 9.1.  But, cf., State v. Rahman (1986), 23 Ohio St.3d 146, 150, 23 OBR 315, 319, 492 N.E.2d 401, 406-407.

Nor can we accept Webb's claim that the records' admission violated his rights under the Confrontation Clause.  See State v. Spikes (1981), 67 Ohio St.2d 405, 21 O.O.3d 254, 423 N.E.2d 1112, paragraph one of the syllabus.  As business records, hospital records fall within a firmly rooted hearsay exception, see Ohio v. Roberts (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608, fn. 8; hence, their admission does not violate the clause.  White v. Illinois (1992), 502 U.S.   ,    , 112 S.Ct. 736, 742, 116 L.Ed.2d 848, 859, fn. 8.

Nonconstitutional error is harmless if there is substantial other evidence to support the guilty verdict.  See State v. Davis (1975), 44 Ohio App.2d 335, 346-348, 73 O.O.2d 395, 401-402, 338 N.E.2d 793, 802-803, citing State v. Cowans (1967), 10 Ohio St.2d 96, 104, 39 O.O.2d 97, 103, 227 N.E.2d 201, 207.  See, also, State v. Diehl (1981), 67 Ohio St.2d 389, 399, 21 O.O.3d 244, 251, 423 N.E.2d 1112, 1119 (Stephenson, J., dissenting); State v. Nichols (1993), 85 Ohio App.3d 65, 73, 619 N.E.2d 80, 86, fn. 6.  Here, the state introduced substantial evidence, independent of the hospital records, that Webb's injuries were inconsistent with his having stood in the path of the blazing trailer.  Webb's own expert witness testified that someone standing in the trailer's path "would burn up" and "would die in three days."  Yet Webb was not killed; his shirt was not burned.

We also find substantial evidence of prior calculation and design.  Webb poured gasoline down the hallway, into the bedrooms, onto Mikey's bed, and down the stairs.  Physical evidence indicates that after he lit the trailer and broke out of the bathroom, he prepared to light another match.  Since the record contains substantial independent evidence of the matters the state sought to prove with the hospital records, we find their admission harmless.

### V. Cumulative Error
In his twenty-first proposition, Webb contends that alleged errors, even if individually harmless, had a "cumulative effect" that denied him a fair trial.  We have

applied a similar "cumulative error" analysis in the past.  See
State v. DeMarco (1987), 31 Ohio St.3d 191, 31 OBR 390, 509
N.E.2d 1256, paragraph two of the syllabus.  In this case, we
find only two cognizable errors (improper opinion testimony and
improperly admitted hospital records), both harmless.  We find
that Webb was not denied a fair trial, and overrule this
proposition.

### VI. Plea Offer as Mitigation

During trial, the state offered Webb a plea bargain; had
he accepted, the state would have sought leave of court to
dismiss the death specifications.  Webb turned it down, but now
insists that he is entitled to the benefit of the bargain he
refused.  In his eighth, ninth, and tenth propositions of law,
Webb contends that the state's willingness to make a plea offer
renders his death sentence "inappropriate as a matter of law."
Alternatively, he contends that the offer is at least a
mitigating factor.4

We rejected such a claim in State v. Sneed (1992), 63 Ohio
St.3d 3, 16-17, 584 N.E.2d 1160, 1172, and see no reason to
accept it here.  A prosecutor's willingness to accept a life
sentence pursuant to a plea bargain is not "relevant to the
issue of whether the offender should be sentenced to death."
R.C. 2929.04(B)(7).

Webb argues that the plea offer indicated that the
prosecutor thought the death penalty inappropriate.  We
disagree.  There could have been a multitude of reasons why the
prosecutor may have offered a plea bargain.  See Wiggins v.
State (1989), 324 Md. 551, 574, 597 A.2d 1359, 1370.

Nor is the offer mitigating under the Eighth Amendment,
since a plea offer "does not relate to the defendant's
character, prior record, or to the circumstances of the offense
* * *."  Davis v. State (1986), 255 Ga. 598, 614, 340 S.E.2d
869, 883.  See, also, Wiggins v. State, supra; People v. Zapien
(1993), 4 Cal.4th 929, 989, 17 Cal.Rptr. 2d 122, 156, 846 P.2d
704, 738; Huffman v. State (Ind.1989), 543 N.E.2d 360, 377,
overruled on other grounds, Street v. State (Ind.1991), 567
N.E.2d 102; but, see, Jeffers v. Ricketts (D.Ariz. 1986), 627
F.Supp. 1334, 1358, reversed on other grounds (C.A.9, 1987),
832 F.2d 476.

A prosecutor's offer to negotiate a guilty plea in a
capital case is not a mitigating factor under either R.C.
2929.04(B)(7) or the Eighth Amendment; thus, it follows that
such an offer does not affect the appropriateness of the death
penalty.  Therefore, Webb's eighth, ninth, and tenth
propositions fail.

In Webb's eleventh proposition, he calls his trial counsel
ineffective for waiving this issue.  Since the issue is not
waived, Webb's eleventh proposition fails.

### VII. Disclosure of Grand Jury Testimony

In questioning witnesses Joseph, Larry, and David Beck,
the prosecutor quoted from their grand jury testimony.  The
defense requested disclosure of the grand jury testimony, but
the trial court refused.  In his eighteenth proposition of law,
Webb contends that the defense was entitled to see the Becks'
grand jury testimony under Evid.R. 106.

Evid.R. 106 provides that, when a party introduces a
statement or part thereof, the other party "may require him at

that time to introduce any other part * * * which is otherwise admissible and which ought in fairness to be considered contemporaneously with it." However, since the grand jury testimony is not in the record, we cannot determine whether this rule applies. In any event, the issue is not whether the grand jury testimony should have been admitted, but whether it should have been disclosed to the defense. Thus, the court of appeals correctly analyzed this issue, not under Evid.R. 106, but under State v. Greer (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982. The appellate court held the defense entitled to disclosure, but found harmless error.

Under Greer, an accused may not see grand jury transcripts unless he shows "that a particularized need for disclosure exists which outweighs the need for secrecy." Id., paragraph two of the syllabus; see, also, State v. Patterson (1971), 28 Ohio St.2d 181, 57 O.O.2d 422, 277 N.E.2d 201, paragraph three of the syllabus. Such a need exists where nondisclosure will probably "deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony." Greer, paragraph three of the syllabus. Finally, the trial court has "discretion as to whether the particularized need * * * has been shown to its satisfaction." Id., 66 Ohio St.2d at 148, 20 O.O.3d at 163, 420 N.E.2d at 988.

The court of appeals held that Webb showed need because "[w]ithout access * * * [he] was not able to evaluate whether or not the statements read to the jury needed to be clarified." But in citing the mere possibility that the statements "needed to be clarified," the court of appeals applied the wrong standard. It is always conceivable that grand jury material might be quoted out of context, but general assertions, citing no specific facts of record, do not establish particularized need. State v. Richey (1992), 64 Ohio St.3d 353, 366, 595 N.E.2d 915, 927; State v. Lawson (1992), 64 Ohio St.3d 336, 345, 595 N.E.2d 902, 910. Webb had to show that nondisclosure would probably deprive him of a fair trial, and that the trial court abused its discretion by not so finding. There is no basis here to surmise that the prosecutor used the testimony misleadingly. 5

Nor does Webb cite any other specific basis for finding particularized need. Webb speculates that the grand jury testimony might have contained material evidence or might have aided his cross-examination of the Becks by revealing contradictions. These arguments could be made in every case. Nothing in the record supports them here.

The trial court did not abuse its discretion, but reasonably found that Webb had not shown particularized need. Webb's eighteenth proposition is overruled.

### VIII. Trial Court's Weighing

In his seventh proposition, Webb objects to the trial court's sentencing opinion. None of his complaints has merit.

After a thorough consideration of the sentencing opinion, we find that the trial court reviewed all of the evidence, applied the appropriate weight to each factor, and made "specific findings as to * * * the aggravating circumstances the offender was found guilty of committing * * * ." R.C. 2929.03(F). Having found the indictment's specifications proven, the court properly set forth the evidence supporting

that finding.  Finding no merit in any of Webb's arguments, we overrule his seventh proposition.

Webb contends in his nineteenth proposition of law that the aggravating factors did not outweigh the mitigating factors.  After a thorough consideration of the record, we find no merit to this claim.

## IX. Jury Issues

Webb alleges that a venireman proclaimed Webb's guilt during voir dire in front of other veniremen.  In his twelfth proposition, Webb contends that the trial judge should have investigated this allegation more thoroughly.

After the jury was seated, Jacquelyn Griffis, a spectator, told the prosecutor she had overheard a venireman discuss the case during voir dire; this venireman fit the description of a venireman who had been peremptorily removed.  At the defense's request, the court called Griffis to testify.  She testified that, during a recess in the voir dire, she went outdoors.  There she saw a "loud and boisterous" man, whom she knew to be a venireman, talking to a black man and a woman; Griffis was unsure whether they were also veniremen.  The loud venireman said Webb was guilty; his companions "looked upon [him] with some disdain."

Defense counsel then asked that juror McDonald be voir dired; since only two jurors were male, counsel felt "certain" he was the black man Griffis had seen the venireman talking to.  When examined, however, McDonald didn't recall talking to anyone about the case, and Griffis told the prosecutor she had not seen McDonald.  The defense sought no further inquiry.

Webb claims the trial court should have voir dired the whole jury.  However, "[t]he scope of voir dire is within the trial court's discretion * * *."  State v. Bedford (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913, 920.  Here, after doing everything defense counsel asked, the court reasonably found the evidence did not warrant further investigation.  We find no abuse of discretion and overrule this proposition.

In his thirteenth proposition, Webb contends that venireman Justice was improperly excluded for opposing the death penalty.  "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties * * *."  Adams v. Texas (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589.  Accord State v. Beuke (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284.  The trial court's finding is entitled to deference and will be affirmed absent abuse of discretion.  Wainwright v. Witt (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841, 853; State v. Wilson (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 414, 280 N.E.2d 915, 920.

Justice initially said she "would have trouble" recommending death even if the facts warranted it.  She specifically admitted that her views would bias her and substantially impair her ability to sit at the penalty phase.  She thought she would hold to those views "under almost any circumstances," and said impartiality "would be * * * extremely difficult."  Asking leading questions, defense counsel got Justice to concede she could follow the court's instructions and listen to the evidence, but even then she hedged, stating

that imposing death "would be real hard to live with."

Justice then asked to approach the bench because "I don't know if I can say this out in court without getting emotional * * * ." At sidebar, she explained that an event in her past would make it "extremely difficult for me to find a verdict of guilty if I knew * * * that I would sentence him to death * * * even though up here (motioning to head) I was convinced that I did the right thing. * * * I don't think I could do it based on that." (Emphasis added.)

Justice was properly excused: the record supports a finding that her views would have substantially impaired her performance of duty in accordance with her instructions and oath. Webb's focus on the answers his counsel extracted from Justice is misplaced; it was the trial court's job to decide which of Justice's conflicting "answers reflected her true state of mind." State v. Tyler (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576, 586. Webb's thirteenth proposition is overruled.

### X. Tax Returns

In his fourteenth proposition, Webb contends that the state violated his Fifth Amendment privilege when it subpoenaed copies of his federal income tax returns for 1986, 1987, 1988, and 1989 from his tax preparer and introduced them at trial. However, a taxpayer's Fifth Amendment privilege is not violated by enforcement of a subpoena against his accountant because "the ingredient of personal compulsion against an accused is lacking." Couch v. United States (1973), 409 U.S. 322, 329, 93 S.Ct. 611, 616, 34 L.Ed.2d 548, 554. Accord Cincinnati v. Bawtenheimer (1992), 63 Ohio St.3d 260, 264, 586 N.E. 2d 1065, 1068, fn. 2. Moreover, statements on tax returns are not "compelled." A taxpayer may assert the Fifth Amendment privilege on his return; if he answers the questions instead, he does so voluntarily. Garner v. United States (1976), 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370. We overrule this proposition.[7]

### XI. Character Evidence

In his sixteenth proposition, Webb contends that the state introduced evidence of his bad character, violating Evid.R. 404. The prosecutor asked Tami Webb whether her father's frequent calls and visits to Nadine Puckett were "out of character" and whether Webb was "the type of person" to do such a thing. Tami replied: "It depends on what it was for," adding that Puckett "had been through a lot, and my father is a very compassionate man. And I think that he was just being a friend to her."

We agree with Webb that this was character evidence. However, Evid.R. 404(A) and (B) bar such evidence only when it is used to show that a person acted in conformity with a character trait on a particular occasion. The prosecutor did not use Tami's testimony for that purpose; on the contrary, he used it to show that Tami's view of Webb's character was at odds with Webb's behavior, demonstrating the depth of Tami's bias. Indeed, had her testimony been used to show Webb's conduct, it could only have helped him; she spoke nothing but good of his character. Her testimony hurt Webb for precisely the same reason it was admissible -- because it was not used to show conduct.

Webb's other complaints also lack merit. The prosecutor asked Tami whether it would surprise her to discover that Webb had planned to leave Susan. Tami said it would because "the relationship was good." The prosecutor then suggested that a prior statement by Tami was "not a ringing endorsement of * * * their relationship."7 Tami said the relationship "was average, I guess. * * *" This was not character evidence. Webb's feelings toward Susan were relevant to show why he tried to kill her. Likewise, evidence of Webb's relations with Nadine Puckett went to motive. Webb's sixteenth proposition is overruled.

## XII. Witnesses Called by Court

At the state's request, the trial court called Susan and Tami Webb as court's witnesses, allowing both parties to cross-examine them under Evid.R. 614(A). In his seventeenth proposition, Webb contends that this was error. According to Webb, a court may not call its own witness at a party's request, unless the court finds that the requesting party would be entitled to lead the witness on direct under Evid.R. 611(C).

Webb's argument has no basis in either rule. Evid.R. 611(C) in no way purports to limit the trial court's power to call its own witnesses. Cf. State v. Apanovitch (1987), 33 Ohio St.3d 19, 22, 514 N.E.2d 394, 398, citing State v. Dacons (1982), 5 Ohio App.3d 112, 5 OBR 227, 449 N.E.2d 507 (Evid.R. 607 requirements inapplicable to witness called by court at state's request). We reject Webb's seventeenth proposition.

## XIII. Ineffective Assistance

In his twenty-fourth proposition, Webb contends that his counsel rendered ineffective assistance by not objecting to certain penalty-phase prosecution arguments. (See discussion of propositions four, five, and six, supra.) We disagree. The arguments were relevant to the statutory aggravating circumstances of arson and attempted multiple murder; therefore, counsel could reasonably conclude that they were not objectionable references to "nonstatutory" aggravation. Webb has not shown "that counsel's representation fell below an objective standard of reasonableness." Strickland v. Washington (1984), 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.

## XIV. Settled Issues

We overrule propositions twenty and twenty-six on authority of, respectively, State v. Steffen (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus, and State v. Mills (1992), 62 Ohio St.3d 357, 371-372, 582 N.E.2d 972, 985-986.

## XV. Independent Review

R.C. 2929.05(A) requires us to review Webb's sentence independently. We must weigh the aggravating circumstances against the mitigating factors and consider whether the death sentence is disproportionate to sentences in similar cases.

Webb was convicted of two aggravated murder counts; as both involve the same victim, they merge. State v. Huertas (1990), 51 Ohio St.3d 22, 28, 553 N.E.2d 1058, 1066. There are two aggravating circumstances. First, Webb committed the murder while committing aggravated arson. R.C. 2929.04(A)(7). In assessing this circumstance's weight, we think it relevant

to take into consideration the method Mikey Webb's father chose to execute his plan.  Mikey suffocated from smoke inhalation, and he also suffered burns over seventy to eighty percent of his body.  He died in fear as well as pain: a firefighter found him hiding under his bed in a fetal position.

Second, the murder was part of a course of conduct involving the purposeful attempt to kill two or more persons.  R.C. 2929.04(A)(5).  Here, Webb attempted to kill four other people.  As a result, Susan and Charlie both sustained burns on twenty percent of their bodies.  Charlie had to wear a mask for twenty-two hours daily to prevent facial scarring.

In the penalty phase, ten of Webb's friends and relatives came to plead for his life.  Webb also made an unsworn statement.

Webb's father died when Webb was only twelve.  His mother testified that this caused him to withdraw and have "problems associating with the family."  Webb's IQ was once measured at sixty-four, and he dropped out of ninth grade.  However, by the time he took the GED exam, his IQ was measured at one hundred five.

Webb married his first wife, Linda, in 1968.  After two years in the Army, he was honorably discharged in 1970.  Tami was born that year and Amy in 1973.

In 1978, Linda was killed and Amy was badly injured in an auto accident. Though devastated by Linda's death, Webb visited Amy daily in the hospital and stayed overnight three times a week.

Webb later remarried, but his second marriage ended in divorce.  He married his third wife, Susan, in 1986, and they had two sons, Mikey and Charlie.  Webb experienced financial difficulties during the late 1980s.

Webb's family and friends testified that he was a loving, attentive father, and his family would miss him sorely.  Tami testified that "if it wasn't for my father, I couldn't make it through some of the stuff I've been through."  Amy said: "He'll always be there if I need to talk to him."

Susan testified that Webb is very close to Charlie.  "[W]hen Charlie was in the hospital * * *, no one could get Charlie to respond but Mike * * *."

Witnesses described Webb as "friendly and outgoing," and the family's "peacemaker."  His mother said: "He doesn't like to hurt anything."  Webb got upset when his brother-in-law "came down on his children a little bit hard."

The witnesses emphasized that Webb's family will suffer if he is executed.  In his unsworn statement, Webb said:  "If you take my life, you'll be taking my mother's life."  Webb's half-brother agreed.  Susan said: "I don't see how Charlie would be able to cope * * * in this community having a daddy who has been killed or is on death row."

Webb's family clearly loves him and believes in his innocence, even though some of them were targets of his murder plot.  Of course, Webb's family is biased; it is natural that his loved ones cannot believe him capable of these horrible crimes, even in the face of the evidence.  Their testimony deserves some weight.

Webb's history and background afford little mitigation. His honorable military service during wartime (but for an

injury, he would have gone to Vietnam) deserves some weight.

The trial court found the premature deaths of Webb's father and first wife mitigating, but we do not.  While those deaths evoke sympathy, mere sympathy is not mitigation, and Webb has not shown that the murder was "attributable to" those events.  California v. Brown (1987), 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934, 942 (O'Connor, J., concurring).  Nor is Webb's IQ mitigating.  There was neither expert testimony on its meaning nor any indication that low intelligence had any relationship to the crimes.  We also disagree with the trial court's apparent belief that Webb's relationship with Nadine and his thefts from his daughters are mitigating.  However, Webb's money problems presumably contributed to his crimes, and that is a mitigating factor, though a weak one.

Webb argues residual doubt, but this, if mitigating at all, is weak.  No evidence links anyone but Webb to the fire, and Tami's testimony about a man in a red sweatshirt is unconvincing.

The aggravating circumstances are unusually significant.  Webb tried to destroy by arson five human lives -- the lives of those who loved him most, as the record shows, and whom he should have loved most.  We find that aggravating circumstances outweigh mitigating factors beyond a reasonable doubt.  The death penalty is therefore appropriate.

The death penalty is also proportionate.  The most comparable case is State v. Grant (1993), 67 Ohio St.3d 465, 620 N.E.2d 50.  In Grant, given the same aggravating circumstances and similar facts -- the defendant murdered her two children by arson for insurance money -- we affirmed the death penalty.  Grant killed more people than Webb, but Webb intended to kill five.  And unlike Webb, Grant was "raised in an environment where human life was not greatly valued."  67 Ohio St.3d at 486, 620 N.E.2d at 71.

The judgment of the court of appeals is affirmed.

                              Judgment affirmed.

Moyer, C.J., A.W. Sweeney, Douglas, Wright, F.E. Sweeney and Pfeifer, JJ., concur.

FOOTNOTES

1 Though the Ex Post Facto Clause "does not of its own force apply to the Judicial Branch," Marks v. United States (1977), 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260, 265, due process places similar constraints on a court's power to apply precedent to cases arising before the precedent was announced.  See Bouie v. Columbia (1964), 378 U.S. 347, 353-354, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894, 900.  While we have applied Jenks retroactively in State v. Waddy (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825, in State v. Franklin (1991), 62 Ohio St.3d 118, 124, 580 N.E.2d 1, 7, and in Jenks itself, we have not addressed the ex post facto issue.

2 While Tami may have given her consent during the trial, subsequent ratification is no defense.  State v. Warner (1990), 55 Ohio St.3d 31, 66, 564 N.E.2d 18, 50.

3 We note that R.C. 2921.22(E)(3) requires hospitals to report "any burn injury * * * that shows evidence of having been inflicted in a violent, malicious, or criminal manner," and R.C. 2921.22(E)(5) provides that "evidence regarding a

person's burn injury or the cause of the burn injury" is unprivileged "in any judicial proceeding resulting from a report submitted pursuant to" R.C. 2921.22(E). However, the record does not show whether any such report was made, nor has the state invoked these statutes at trial or on appeal.

4 Webb did not argue at trial that the plea offer was a mitigating factor; he thus waived his claim that the trial court should have considered it or instructed the jury to do so. State v. Henderson (1988), 39 Ohio St.3d 24, 30, 528 N.E.2d 1237, 1244. However, he did argue on appeal that the plea offer was mitigating, thus preserving his claim that the court of appeals should have considered it on independent review. Moreover, Webb contends that the plea offer barred the death penalty altogether; if that is true, Webb's death sentence is plain error, for the sentence "clearly would have been otherwise" but for the error. State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph one of the syllabus. We therefore reach the merits.

5 At trial, Webb argued that the prosecutor had taken a witness's statement to police out of context, and thus might do the same with the grand jury testimony, creating a need for Webb to see it. However, the prosecutor gave the witness an opportunity to explain his statement; hence, we find no prosecutorial duplicity.

6 Webb also suggests that the copies admitted at trial were inadmissible because they were unsigned. We disagree. The Webbs' tax preparer testified that the exhibits were copies of the Webbs' 1986-1989 returns and that the Webbs had supplied the information contained thereon. This authenticated the exhibits.

7 When an investigator asked Tami whether Webb was affectionate to Susan, Tami allegedly said: "He's never beat her, let's put it that way."