DECISION.
Appellant Gerald Watson and an accomplice, Marlin Thomas, engaged in a vicious crime spree on a Christmas night. When the spree concluded with a car crash following a high-speed chase, four victims, including an eighty-three-year-old woman, had been injured.
A jury found Watson guilty on ten of the thirteen resulting felony counts. The trial court sentenced him to forty-one years' incarceration. Watson now appeals, raising six assignments of error. We overrule each of Watson's assignments of error and affirm the trial court's judgment.
I. A Vicious Spree
Watson and Thomas's rampage began after dark on a Christmas evening. Their first victim, Antwan Davis, was walking to a party at his cousin's house when a conversion van stopped a few feet from him. Two masked men jumped out of the van and accosted him. One of the masked figures held a gun to Davis's head with one hand while grabbing and ripping Davis's pockets with the other. The second masked figure stood off to the side, also holding a gun.
When it became apparent that Davis had been truthful in exclaiming that he had nothing worth stealing, the masked man pulled the trigger of the gun aimed at Davis's head. Davis heard the metallic click, but the gun did not fire. Davis ran for his life.
As he ran, he heard his two assailants arguing. One asked the other why he had not shot Davis, and then he yelled, "Kill him. Shoot him." In response, two shots were fired and Davis was hit in the back of the knee. But he limped on, screaming for help, until he attracted the attention of a passerby, who called 911. Davis was transported to a hospital, where he described the attack and his assailants to the police.
Less than an hour later, Steven Ungerbuehler was driving his mother's friend, eighty-three-year-old Mary Barnett, home from Christmas dinner. As they parked the car and began to walk up the driveway to the front door of Barnett's home, a van stopped behind them. Two masked men got out. One of the men was brandishing a weapon and commanded Ungerbuehler and Barnett to "get down." Barnett did not hear the command even though she was wearing both of her hearing aids. The assailant smashed her in the face with his gun and broke her nose when she failed to comply with his instructions. As she lay helpless, screaming and bleeding on the ground, he shot her in the arm and took her purse. The accomplice stole Ungerbuehler's wallet, and both men got back in the van and drove off.
A few minutes later, Cincinnati police officer Lilgenia Texter barely avoided a collision with a large van as it sped through a stop sign and almost struck the side of her patrol car. She and her partner activated the patrol car's lights and siren and pursued the van. The van initially pulled over, but when the officers got out of the patrol car and began to approach the vehicle, the driver sped away.
The driver of the van, later identified as Marlin Thomas, led the police on a chase through residential neighborhoods at speeds in excess of eighty miles per hour. During the chase, Officer Textler learned that the van that she and her partner were pursuing had been reported stolen. Also during the chase, Officer Textler saw the van's passenger throw some objects out of the window. Those items, which included a white purse, were later recovered and identified as the belongings stolen from Mary Barnett.
But there would be one more victim before Thomas and Watson's rampage ended. Anthony Jones had just left Christmas dinner with his girlfriend. He was driving through an intersection when, from the corner of his eye, he caught a glimpse of a van rushing at him. The van barreled through a stop sign, crashed into his car, and flipped over. Jones was knocked unconscious by the collision and awoke in the hospital with a concussion and injuries to his ribs and back.
The stolen van's driver, Thomas, was also knocked unconscious by the collision. But the passenger, Watson, climbed out of the overturned van's passenger side window and fled on foot. A police canine unit later tracked him to his hiding place under a nearby porch, where he was arrested. Meanwhile, officers had arrested Thomas and had searched the van. They found two bandanas, a loaded gun, and Ungerbuehler's wallet. The gun was later identified as the weapon that had been used to shoot Barnett.
A jury found Watson guilty on ten of the thirteen counts upon which he had been indicted. The trial court ordered Watson to serve more than the minimum sentence of incarceration for each offense. It also ordered that each sentence of incarceration be served consecutively, for a cumulative total of forty-one years.
II. Six Assignments
In his six assignments of error, Watson now claims that the state improperly used its peremptory challenges to systematically exclude black jurors. He also argues that the assistant prosecutor unfairly commented in closing argument on his failure to testify. He further maintains that one of his ten convictions was based on insufficient evidence, and he separately contends that all ten were against the manifest weight of the evidence. He next complains that his sentence of incarceration was too long because the trial court did not make the appropriate findings to support the imposition of consecutive sentences, each greater than the minimum allowable. Finally, Watson asserts that the trial court erred by failing to sua sponte declare a mistrial when a detective testified that he had refused to be interviewed when he had been taken to the hospital.
For the reasons that follow, we overrule Watson's six assignments of error and affirm the trial court's judgment.
III. No Batson Violation
First, Watson argues that the state exercised its peremptory challenges to systematically exclude blacks from his jury in violation of his constitutional rights to equal protection and due process.[1] Proof of this allegation is typically a two-step process. Watson must first have established a prima facie case of purposeful discrimination, after which the burden would have shifted to the state to produce a race-neutral explanation.[2] But where, as here, the state proceeded with an explanation as if a prima facie case of racial discrimination had been established, and the court ruled on the defendant's motion, the issue of whether a prima facie case of discrimination had been established became moot.[3]
Thus, we restrict our analysis to whether the explanations offered by the state were race neutral. The state's explanations need not have been persuasive, or even plausible.[4] "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."[5] And a trial court's determination that there was no discriminatory intent in the state's exercise of its peremptory challenges will not be reversed on appeal unless it was clearly erroneous.[6]
In this case, the state exercised three peremptory challenges. Two of the three jurors excused by the state were black. The state excused the first black juror because he disclosed during voir dire that he had been convicted of theft. Because the state offered the race-neutral explanation that it did not want a juror who had been convicted of a crime of dishonesty, the trial court did not err in overruling Watson's objection to this peremptory challenge.
The second prospective juror that the state excused, prospective juror Bunton, had responded to some general questions by saying that he had had "several" bad experiences with the police since he was "a black male here from Cincinnati." He went on to say that he had negative feelings about the police because of "being stopped for no reason," being issued tickets, and experiencing the "mistrust" the police had demonstrated in their encounters with him. But he also said that he felt that he could set all his negative feelings aside and judge the case strictly on its merits.
Later, when the trial court asked if there were any general concerns that any of the prospective jurors had, Bunton expressed a concern. He pointed out that when the court asked "folks to tell the truth, so help you God," "[t]he court never asked the people if they believe in God." This concerned the prospective juror.
The state excused prospective juror Bunton, citing two reasons: that he had expressed negative feelings about the police, and that he had appeared to be hypertechnical because of his concern over the oath. Since the state would be relying on circumstantial evidence to prove its case, the assistant prosecutor said that he was concerned that Bunton might hold the state to a higher burden of proof than the law required. Watson now asserts on appeal that, because Bunton's negative feelings about the police stemmed from race-based confrontations, the state sought to excuse him, at least indirectly, because of his race.
The issue was Bunton's negative feelings about the police, not the manner in which he had arrived at them. But the state also offered another explanation for excusing Bunton that was unarguably race-neutral, his hypertechnicality. The trial court did not err in overruling Watson's objections, and thus we overrule his first assignment of error.
IV. No Prosecutorial Misconduct
In his second assignment of error, Watson argues that, in closing argument, the assistant prosecutor improperly referred to his decision not to testify on his own behalf. According to Watson, this misconduct was especially egregious since it occurred not once but twice, and the second occasion immediately followed the trial court's curative instructions to the jury. We overrule this assignment of error for several reasons.
For a true perspective on the portion of the prosecutor's closing argument that Watson finds objectionable, it is necessary to begin with his own trial attorney's opening argument. There, Watson's attorney stated that "[y]ou [the jury] are going to hear from Mr. Watson, or at least he is planning on testifying right now, and what he is going to tell you is * * *." At this point Watson's attorney wove a fanciful tale of an innocent man who happened to be hitchhiking on his way home from visiting his girlfriend, only to inadvertently end up in a van with several bad people. He explained that Watson would testify that he had yelled for the driver to stop when the police pursued the van after its driver failed to yield the right of way at an intersection. And he said that Watson would explain that the reason that he ran from the police after the van crashed was because "he had a misdemeanor warrant for a driving offense and he didn't want to get arrested." But neither Watson nor anybody else ever testified to this version of events.
The assistant prosecutor, during his closing argument, reminded the jury that, at the beginning of the trial, Watson's attorney had promised "to tell you why my client fled." Then he challenged the jury to recall "which witness said anything about why he fled?" Watson's attorney objected, explaining that he felt the prosecutor was impermissibly commenting on Watson's decision not to testify. The trial court admonished the jury that "when a defendant elects to exercise his constitutional right not to testify * * * you may not consider it for any purpose."
Immediately after the trial court's admonition to the jury, the assistant prosecutor stated to the jury that he had not intended to comment on Watson's decision not to testify, because the state bore the burden of proof. He continued, "But the police officers who arrested them testified, and other people who had contact, they testified. The explanation why he ran, the Judge is going to give you an instruction on evidence of flight." To the extent that this last comment makes sense, it appears that the assistant prosecutor was attempting to point out to the jury that the only evidence concerning Watson's motive for flight had come from the state's witnesses.
It is misconduct for a prosecutor to directly comment on a defendant's failure to testify in a criminal proceeding.[7] Such misconduct might warrant a reversal of the defendant's conviction if it prejudiced the defendant's substantial rights to a fair trial.[8] Conversely, the state certainly is free to comment upon a defendant's failure to offer evidence in support of his case[9] and thus may comment upon the weight of the evidence that the defendant has presented in support of an exculpatory theory.[10]
Admittedly, there is some tension between the state's right to comment on the lack of evidence that a defendant has introduced to support his case and the imperative to refrain from commenting on the defendant's failure to testify. But, generally, for a comment to impinge upon the defendant's right not to testify, it must have been "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."[11]
Comments pertaining to the weight of the evidence that only indirectly implicate the failure of the defendant to testify are permissible if the state does not imply that the burden of proof has shifted to the defense.[12]
We hold that the assistant prosecutor's comments were a fair challenge to the weight of the evidence that Watson had presented at trial to support his theory of why he had fled from the crashed van. In fact, the assistant prosecutor went out of his way to explain to the jury that the burden of proof had not shifted. Further, if there had been any doubt in the juror's minds, the trial court clearly and effectively told them that they could not consider Watson's failure to testify for any reason.
And, finally, it was Watson's own attorney who had promised to support his theory of the case with Watson's testimony. When that evidence had not been presented, and the assistant prosecutor had pointed to the lack of evidence to support Watson's theory, any implication concerning the defendant's failure to testify was of Watson's own creation. He invited it.[13] We thus overrule Watson's second assignment of error.
V. A Passenger Can be Found Guilty
In his third assignment of error, Watson argues that there was insufficient evidence for him to have been convicted of seriously injuring Anthony Jones, the driver of the car with which the van collided while immediately fleeing the robbery of Ungerbuehler and Barnett.[14]
Watson also protests his conviction on "the forearm [sic] specifications attached to this count," since he claims there was insufficient evidence for him to have been convicted on the underlying charge. Presumably he means the firearm specifications.
We will not reverse a jury's guilty verdict for insufficient evidence when, with the evidence viewed in a light most favorable to the state, there is substantial evidence upon which the jury could have concluded that all of the elements of the charged offense had been proved beyond a reasonable doubt.[15]
Watson argues that he was not driving the van, so he should not have been held responsible for the harm that followed. Or, alternatively, since the driver of the van initially pulled over and only sped away after the police approached, the physical harm to Jones did not occur "immediately" after the robbery, as required by the statute.
Both of Watson's arguments lack merit. Even though he was not driving the van during the high-speed chase, and even though he did not steer the van into Jones's car, he was an accomplice to those acts.[16] He actively participated in a series of robberies, fled the crime scene with his partner, and would have benefited had Thomas escaped. Though cited by neither side, the case of State v. Branson is directly on point on this issue.[17] And one who aids or abets another in committing a crime[18]
can be "prosecuted and punished as if he were the principal offender."[19]
Watson's argument that Thomas's conduct in initially pulling over in response to the police's signal attenuated the robbery from the act of fleeing is no more availing. The jury could have reasoned that the van had barreled through the intersection and had almost hit the police car because its occupants were in a hurry to get away from the robbery that they had just committed. The jury could also have reasoned that the act of stopping the van and then speeding away when the officers began to approach on foot was not so much an interruption of their efforts to flee as a strategy to maximize their lead in the coming chase.
Watson's third assignment of error is overruled.
VI. The Weight of the Evidence was Staggering
Watson's fourth assignment of error centers on the weight of the evidence rather than its sufficiency. He argues that his convictions were a manifest miscarriage of justice since (1) he did not have a gun when was discovered in his hiding place under a porch, (2) "no other bun [sic]" besides the one discovered in the van was ever found, (3) no gunshot-residue testing linked him to firing a gun, and (4) the interval between the robberies and the chase provided time for him to have gotten in the van as an innocent hitchhiker after the robberies had occurred.
To reverse Watson's convictions on the manifest weight of the evidence, we would have to unanimously conclude, after weighing the evidence and all reasonable inferences, considering the credibility of the witnesses, and resolving any conflicts in the evidence, that the jury clearly lost its way.[20] Watson's jury did not lose its way. The jury was not required to accept an improbable story, for which no evidence was offered. We thus overrule Watson's fourth assignment of error.
VII. Sentence Appropriate
In Watson's fifth assignment, he focuses on his sentence. Specifically, he contends that the trial court erred by imposing a sentence harsher than the minimum sentence for each offense and by ordering that the sentences be served consecutively. It is true that the trial court did not completely fill out the sentencing worksheet. The court neglected to check two sections that would have substantiated the thought processes used in imposing more than the minimum sentence and the consecutive sentences. Of course, though helpful, the worksheet is just that, and the record can support the sentences even absent a worksheet.
But we can glean from the court's statements at the sentencing hearing its rationale for imposing a sentence greater than the minimum, and for ordering that the sentences be served consecutively. The trial court commented extensively and used all the statutory language. Especially in view of the viciousness of the crime rampage, we believe that the record amply supports the sentence. Accordingly, we overrule Watson's fifth assignment.
VIII. An Officer's Unfortunate Comment
Watson's sixth and final assignment of error relates to the testimony of the detective who first attempted to interview Watson and Thomas. According to the detective, he "Mirandized the two suspects and attempted to interview them. They both refused interviews." The detective went on to testify about other matters before Thomas's attorney belatedly objected to the detective's reference to the defendants' silence. The trial court sustained the objection and instructed the jury that the remark was to be stricken, and that the defendants had "a right not to testify and not incriminate themselves. It can't be used against them for any purpose."
Watson now argues that the detective's testimony was a constitutionally impermissible use of his post-arrest silence. He is of course correct, as the trial court acknowledged by striking the testimony and so informing the jury. But Watson extends his argument by complaining that the error was so egregious that the court should have sua sponte declared a mistrial. We do not think so.
The case that Watson cites[21] to support his extended argument is readily distinguishable. In that case, the prosecutor elicited testimony about the defendant's silence and commented on it in his case-in-chief. Further, the trial court instructed the jury that it was permitted to use the defendant's silence as substantive evidence of his guilt.[22] There was nothing so egregious in this case, and we find nothing in the record to suggest that the jurors were incapable of understanding the court's proper instructions. At most, the officer made an unfortunate statement, but there is no reason to believe that it was intentional, or that it was intended to deprive Watson of a fair trial. The trial court properly sustained the objection and instructed the jury to disregard the comment. The defense did not even request a mistrial. For the judge to have sua sponte granted one would have been overkill. Thus we overrule Watson's final assignment of error and affirm the trial court's judgment.
Judgment affirmed.
Doan and Hildebrandt, JJ., concur.
[1] See Batson v. Kentucky (1986), 476 U.S. 79, 89,106 S.Ct. 1712.
[2] See State v. Hill (1995), 73 Ohio St.3d 433, 444-445, 653 N.E.2d 271, citing State v. Hernandez (1992), 63 Ohio St.3d 577, 582-583,589 N.E.2d 1310.
[3] See State v. Walker (2000), 139 Ohio App.3d 52, 56, 742 N.E.2d 1173, quoting State v. White (1999), 85 Ohio St.3d 433, 437, 709 N.E.2d 140.
[4] See Purkett v. Elem (1995), 514 U.S. 765, 767, 115 S.Ct. 1769.
[5] See Hernandez v. New York (1991), 500 U.S. 352, 360,111 S.Ct. 1859.
[6] See State v. Hernandez, 63 Ohio St.3d at 583, 589 N.E.2d 1310.
[7] See State v. Thompson (1987), 33 Ohio St.3d 1, 4, 514 N.E.2d 407;State v. Lynn (1966), 5 Ohio St.2d 106, 214 N.E.2d 226, paragraph one of the syllabus.
[8] See State v. Smith, 87 Ohio St.3d 424, 442, 2000-Ohio-450,721 N.E.2d 93.
[9] See State v. Collins, 89 Ohio St.3d 524, 527, 2000-Ohio-231,733 N.E.2d 1118 (citations omitted).
[10] See State v. Watson (1991), 61 Ohio St.3d 1, 9, 572 N.E.2d 97.
[11] See State v. Fears (1999), 86 Ohio St.3d 329, 336, 715 N.E.2d 136, citing State v. Webb (1994), 70 Ohio St.3d 325, 328, 638 N.E.2d 1023, quoting Knowles v. United States (C.A.10, 1955), 224 F.2d 168, 170.
[12] See State v. Collins, 89 Ohio St.3d 524, 528, 2000-Ohio-231,733 N.E.2d 1118.
[13] See, generally, State v. Poor (Jan. 2, 1985), 1st Dist. No. C-840280; State v. Tucker (Dec. 14, 1983), 1st Dist. No. C-830161.
[14] See R.C. 2911.01(A)(3).
[15] See State v. Waddy (1992), 63 Ohio St.3d 424, 588 N.E.2d 819.
[16] See State v. Ranson, 10th Dist. No. 2398, 2002-Ohio-2398, ¶ 32.
[17] Id.
[18] See R.C. 2923.03(A)(2).
[19] See R.C. 2923.04(F).
[20] See State v. Thomkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[21] See Combs v. Coyle (C.A.6, 2000), 205 F.3d 269.
[22] See id. at 286.