JOURNAL ENTRY AND OPINION
Defendant-appellant John Bourdess ("appellant") appeals his convictions for felonious assault in violation of R.C. 2903.11
and aggravated assault in violation of R.C. 2903.12, each with a violence and firearm specification entered in Cuyahoga County Common Pleas Court after jury trial. Appellant challenges these convictions on the basis that errors in the admission of evidence at trial and the improper impeachment of witnesses precluded a fair trial requiring reversal. We find no reversible error and affirm.
In the early morning hours of July 29, 1995, at the corner of W. 41st Street and Bailey Avenue in Cleveland Ohio, appellant and Melinda Taulbee were involved in an altercation with Roger Gandee, Robert Gandee, Jr. and Denise Siebert, in which both Roger Gandee and Robert Gandee, Jr. were shot and injured. As a result, appellant was charged with four counts of felonious assault: count one as to Roger Gandee; count two as to Robert Gandee, Jr. ("Junior"); count three as to James Gandee ("Jimmy"); and, count four as to Denise Siebert. Each count of the indictment carried both a violence and firearm specification. Appellant entered a plea of not guilty to the charges against him and the matter proceeded to jury trial on February 20, 1996.
At trial, the state elicited testimony from Roger, Junior, Jimmy and Denise Siebert in which they described their version of the events. They claimed that appellant either shot or attempted to shoot them without provocation. Appellant, on the other hand, asserted the affirmative defense of self-defense to scare off his attackers and to defend his girlfriend, Melinda Taulbee.
The state's evidence revealed that during the evening hours of July 28, Denise, Junior and Roger spent an hour or one and one-half hours at Henry's bar each consuming between one and two 12 oz. Miller beers. Both Roger and Junior admitted to smoking marijuana, and, earlier in the evening, Roger had taken a prescribed Darvocet for his broken wrist which was in a cast. Sometime between 12:30 and 1:00 a.m., the three left Henry's bar and returned home. They neither purchased more beer at the bar nor on their way home.
When the three arrived in front of their building at the corner of 41st Street and Bailey, Denise parked her car behind two cars which were already there. Roger and Denise got out of the car but Junior remained in the front passenger seat where he "pouted" due to a disagreement with Denise. Denise went into the yard, let her dog out and carried three milk crates for them to sit on. Then, she went upstairs to their apartment to use the bathroom.
Jimmy testified that when he saw Denise and his brothers come home, he stopped and talked with them a few minutes, then, rode off on his bike to get a Mountain Dew to drink. Roger sat on one of the milk crates near the passenger side of the parked car. He suspected that the two occupants of the car were involved either in prostitution or drugs because those activities were common in the neighborhood. When Denise returned from the apartment she sat on a crate alongside Roger. Denise admitted on cross-examination that they intended to sit there until the occupants of the car became uncomfortable with people watching them and they moved on.
Roger asked the occupants to "take it down the road" but he received no response so Denise thought the fellow did not hear him. After Roger asked him again, Denise thought that the fellow responded "what?"; then, Roger walked around the car, up to the driver's window and again asked the occupants to move along, but received no response. Immediately, a shot threw him to the ground. With that, Denise ran to put her dog away, she heard two or three shots; Junior got out of Denise's car to help Roger, he heard two or three more shots fired; and, Jimmy arrived on his bicycle.
From the backyard, Denise could see Roger lying on the ground and could hear Junior hollering at her to stay in the yard. She saw Jimmy reach into the shooter's car in an attempt to get the keys to stop the shooter from leaving. Although wounded, Roger remained aware and saw Denise and the girl scuffle at the passenger door of the other car and into the backyard where appellant fired two or three more shots.
When Junior heard the gunshots he jumped out of the car, grabbed Roger by the foot to pull him out of the way, but fell to the ground. Although he heard appellant's car stall and heard more shots fired, the next thing Junior remembered was waking up at Metro General Hospital twenty-nine days later. Roger spent eight to nine days recovering after undergoing nine and one-half hours of surgery at Metro General Hospital. Both Roger and Junior displayed the scars from the gunshots wounds to the jury.
After Jimmy had ridden away to get a Mountain Dew, he heard four or five "fast" gunshots and screaming and hollering, so he rode his bike back to the corner where he saw both his brothers, Junior and Roger, on the ground and believed they had been killed. He ran up to the shooter's car and attempted to pull him out. When he saw the gun he tried to grab it. While wrestling with the shooter, Jimmy heard more shots and was grazed by a bullet on his chin and left shoulder. With that, he backed away from the car, but heard the car stall so he threw the milk crates at the car in an attempt to stop the shooter from fleeing but the shooter got out of the car, crossed the street and reloaded his gun. Jimmy testified that he thought the shooter ran toward him firing the gun, so he took off running to his mother's house and told her to call an ambulance. When Jimmy returned to the corner, the area was already surrounded by police and he saw that the shooter and the girl were in a police car. He tried to get the police car door open. He showed the police where the box of shells were on the corner.
From the yard, Denise was able to see the shooter reloading the gun. She saw the girl get out of the shooter's car and get into the other car. Denise attempted to stop the girl because she was a witness to the shooting. She ran to the passenger side of the girl's car, saw her with the keys in the ignition, so Denise reached through the passenger side window, grabbed the girl by the hair and pulled her out through the passenger side window. The girl scratched, pushed, kicked, screamed and called out for her boyfriend to help her. Denise tried to drag the girl into the backyard, but the girl grabbed onto the gate. Then, Denise saw the shooter at the end of the gate, he aimed the gun at her and shot once or twice with the bullets going past her head. With that, Denise let the girl go, hopped the fence, ran to her neighbor's house and called "911" for an ambulance on his portable phone. She ran back outside while still on the phone with the police and reported the license numbers of the cars. She saw a police car and screamed for help
On cross-examination, Denise was impeached with two inconsistencies between her trial testimony and her statement made to Det. Hace. In her statement, she indicated that she did not know whether appellant aimed the gun at her. Further, she indicated that the girl had not yet put the keys into the ignition when she grabbed her out of the car. On redirect examination, she explained these inconsistencies between her trial testimony and the July 31 statement resulted from her distraction and distress while she was making her statement to Det. Hace because she received a page from the hospital indicating that Junior's medical condition was quickly declining so she left but returned later the same day to complete the statement. She testified that her misstatements made to Det. Hace were the result of her worry as to whether Junior would live or die.
Patrolman Thomas Connole testified that he was stopped by a motorist who informed him of the shooting at W. 41st Street and Bailey, a known trouble-spot for drug activity. He proceeded to the scene, called EMS and a backup, and looked for suspects. He picked up the suspects and returned to the scene. Two zone cars and EMS were already on the scene. He experienced some crowd control problems because the suspects were in his car. Upon his return, he recovered three shell casings and a box of shells. He said Denise identified the suspects while they were locked in the police car. He went to the hospital where he received the green T-shirt worn by Jimmy.
Next, Charles Gaso, a neighbor who witnessed part of the incident, recalled that he heard three shots, saw Denise and the girl struggling and fighting going toward the back of the store and saw the shooter go toward the back, then he heard two more shots. Although the shooter and the girl attempted to leave in the car, they left by walking in a hurry toward the bridges.
Patrolman Daniel Flanigan of the Cleveland Police Department testified that at the scene he placed the suspects into his zone car and advised them of their Miranda rights. He said that while in the car, appellant spontaneously denied shooting anybody. Patrolman Flanigan took appellant and Melinda Taulbee to Metro General Hospital for treatment. From Metro General he took the suspects to the Justice Center for gunshot residue testing. He said appellant asked whether he could refuse to be tested.
Jean Gandee, mother of Junior, Roger and Jimmy, testified that as a resident of the neighborhood she is active in efforts to rid the area of drugs and prostitution. Her boys, specifically Roger, have assisted her in these efforts.
The state next called Melinda Taulbee, appellant's girlfriend, who testified that she drove her car to W. 41st Street and Bailey on the night of the incident but did not fire a gun that night. Direct examination of Melinda was ended by the state because Melinda was unable to be examined further due to her emotional condition.
On cross-examination by defense counsel, Melinda testified as to her version of the events of that evening. She said she was injured, arrested, handcuffed and held by the Cleveland police for about twenty hours as a result of this incident. The next day, she filed a criminal complaint against Denise Siebert.
Melinda identified photographs taken by the police depicting her injuries showing what she described as a dog bite on her leg, hair torn from her scalp, blood and bruising on her head, a blackeye, bruises on her chin, and scrapes on her arms and legs and waist. She said that on that night she received a phone call from appellant asking her to meet him at the corner of W. 41st Street and Bailey. When she arrived, she saw appellant sitting in his car. She parked her car in front of his, got out of her car and got into the passenger side of his car. They sat and talked for about one half hour. Appellant was crying and told her about the situation with his mother. He was going to give her the gun. Then, a car pulled up behind his. All three occupants got out, each carrying a 40 oz. bottle of beer; one of the men asked them to leave. Appellant asked the group to "give them a minute" but both men walked to the driver's side and, immediately, appellant was hit in the head. She noted the dark-haired guy threw the first punch, then, the other guy started hitting appellant. She got out of appellant's car planning to get into her own car to escape and call the police. However, she was unable to drive away because she left her keys in appellant's car. She was grabbed by the hair by Denise who reached through the passenger window, dragged her out of the car through the window and pulled her through the gate. She screamed for help as the dog bit her. Appellant shot at the dog, picked her up and carried her back to her car, but they were unable to leave because they did not have the car keys, so appellant grabbed her out of the car and started running. While they were leaving the scene, a policeman confronted them and threw them into a patrol car. She said that appellant made no statement while in the patrol car about the shooting. She believed herself to be under arrest when placed in the patrol car, but she was not read her rights. When they arrived back at the corner in the patrol car the scene was "ugly." She and appellant were taken first to the hospital for treatment, then to jail.
After this cross-examination by defense counsel, pursuant to Evid.R. 614, the court finding that Melinda was unable to be examined earlier by the state due to her emotional condition declared her to be a "court's witness" over objection by the defense.
On cross-examination by the state, Melinda said that she knew that appellant had a gun that night because he told her. She conceded that none of the men had any weapons in their hands when they approached the car, but she said they were carrying "40 ouncers" of beer. She said that the dog bit appellant on his left pant leg.
The court, after conducting an in camera inspection of Melinda Taulbee's statement as made to Det. Hace, finding no material inconsistencies between the summary oral statement and her trial testimony, denied the state's request to impeach her with her prior statement. The statement was proffered into evidence by the state.
Detective Charles Sikora of the Cleveland Police Department Scientific Investigation Unit testified as to the results of the gunshot residue tests run on appellant, on Melinda and on the green shirt worn by Jimmy the night of July 29. He explained that due to the degradation of evidence, an acceptable time limit for accurate detection of residue is four hours. The laboratory's standard operating procedure is to perform the testing because evidence can be destroyed or removed relatively easily and, therefore, they do not recognize a right of refusal of this particular test.
Detective Sikora recalled that he was summoned to perform gunshot residue tests on two individuals at about six in the morning of the incident. He performed the test on Melinda Taulbee and opined that in his professional capacity he was unable to form a conclusive statement as to whether she handled or shot a firearm that night. He performed the same test on appellant with the results also being negative. However, when he examined the green t-shirt which had a defect in the left sleeve to determine whether a bullet caused the defect, he found that the defect in the shirt was positive for the presence of lead, finding that the defect was caused by a single bullet. The second defect did not react to lead. On cross-examination, Det. Sikora conceded that he did not test the car or patterns of discharge. On re-direct examination, Det. Sikora opined that if the shooting occurred before 2:00 a.m. and the testing on appellant and Melinda was not done until between 6:00 and 6:15 a.m., the likelihood of detecting anything is extremely small.
Next, in connection with a newly discovered report from the City of Cleveland Mediation Department, the state moved to recall Melinda as a "court witness." Defense counsel objected, The court recalled Melinda Taulbee as a state witness.
The state proceeded to examine Melinda regarding the mediation statement. Over defense counsel's objection, the prosecutor read from the mediation statement and asked Melinda which statements in the mediation summary she recalled making. Although she recalled most statements in the report, she said she did not recall making a statement about "collecting money." Moreover, although she remembers that she told the mediator about the dog, she conceded that there is no mention of a dog or dog bite in the report. Next, without objection, Melinda was shown her medical records and admitted that the medical record fails to indicate she was treated for a dog bite injury.
On cross-examination, to rehabilitate this impeachment, Melinda stated that although she was unable to specifically remember everything she told the mediator, she said that what she told the mediator "was the truth." She said the mediator took notes when she told him what happened, but, the report merely appears to be an unsigned summary of her account. She further explained that the medical records failed to mention the dog attack because she only told the nurse that she was beaten up but she did not explain how the beating happened. She was under the impression that she was under arrest and she understood that she had the right to remain silent when the medical report was taken at the hospital.
On re-direct examination, Melinda conceded that she did not want to cooperate with the state in its prosecution of her boyfriend and she choose not to be interviewed prior to trial to advise the prosecution of the substance of her testimony.
Detective Donald Hace of the Cleveland Police Department testified that he was assigned to this incident on July 29th at 7:30 a.m. when he reported for duty. He went to Metro General Hospital and spoke with Denise and Jimmy. Both Junior and Roger Gandee were in surgery and unable to be interviewed. Detective Hace went to the scene to check the area for bullet shells, but found nothing further. He met with Melinda Taulbee, advised her of her Miranda rights and conducted an interview. He said Melinda referred to appellant as her "ex-boyfriend" not her boyfriend when he took her statement. Later, he interviewed both Denise and Jimmy. During the course of Denise's statement, she was paged and called away to the hospital. He left her partial statement in his typewriter and upon her return, although she was still very upset, she completed the statement. He submitted Jimmy's green t-shirt to SIU for analysis. Melinda contacted him a few days later regarding the return of her vehicle. He identified the tow sheet of Melinda's 1983 Buick Regal, noting that the inventory portion indicates that the keys were present in the vehicle. Subsequently, he interviewed Roger and searched the area for the weapon, but the weapon was never recovered. Through his investigation, he determined that there was no evidence that Denise Siebert, Junior, Roger or Jimmy possessed any weapons during the incident.
The state rested and the defense moved for acquittal pursuant to Crim.R. 29 which was denied by the court.
Appellant testified on his own behalf relating his version of the events in support of his affirmative defense of self-defense. He said that during the course of the evening he spent three or four hours with his cousin at the home of a friend playing basketball. He does not use drugs or alcohol and was neither drinking nor smoking that night. He and his cousin went to his home where they encountered his mother and her boyfriend. Her boyfriend appeared intoxicated and acted mad, his mother was upset and had blood on the bottom of her lip. At his mother's request, he took her boyfriend's gun and box of shells from the house. He was still carrying the rent money he was holding for his mother so her boyfriend could not steal it. He put the gun under the armrest of his car and intended to drive to his aunt's house in Rittman, Ohio; but, when he started thinking about the possibility of getting caught with a gun, he got off the freeway, paged Melinda from a pay phone at W. 41st Street and Bailey, and asked her to meet him there. He waited in his car, when she arrived, she got into the passenger seat and they talked about the situation with his mother and her boyfriend. He asked Melinda to take the gun and the rent money for safekeeping. They engaged in no sexual activity nor bothered anyone in the area.
After about a half-hour the Gandees and Denise arrived and pulled up in a car behind his. A boy on a mountain bike pointed at his car. One of the men from the car walked toward the milk crates and told appellant to move his "f_____g car." Appellant ignored him but the man said it three times, so appellant advised Melinda to get into her own car and leave to avoid any trouble. One man was by the back window and repeated the order to move the car. As appellant turned his head, he started getting hit in the head nonstop. Although he could not even see who was hitting him, he believed it must have been more than one person because even after he fired the gun he was still getting hit. Even before he fired the gun, he tried to start his car to get away but he must have flooded it. Then, once he got his car running, he hit Melinda's car. When he could not get his car restarted and could not get away, because he was in fear of his life, with his right hand he grabbed the gun and fired it twice to scare off his attackers. After the second shot, the punching stopped. Appellant identified his attackers as Roger and Junior.
When he heard Melinda call out his name, he jumped out of the car and ran to the corner. He looked around, did not see her, so he reloaded the gun. Melinda kept on screaming. When he looked in the yard, he saw her lying by the steps with someone holding her by the hair. A dog appeared to be biting her on the leg so he kicked the gate. When the dog ran at him, he fired the gun once into the ground. Then, he picked up Melinda, ran back to her car but discovered she did not have her keys. They got out and walked toward the freeway. Appellant testified that he threw the gun away because he was scared. A policeman stopped them and shined a spotlight on them. They put their hands up and got into the cruiser. The police took them back to the scene where a crowd of people were banging on the cruiser. At the scene, the officers took them out of the cruiser, searched them, read them their rights, transferred them to another police car and they left the scene. Appellant said that he did not remember blurting out a comment that he had "not shot anybody." He asked the officers to take Melinda to the hospital because of her injuries. They were treated at Metro General where he received a CAT scan of his head and Melinda was examined. Then, they were taken to the police station where a gunshot residue test was to be administered. He was reluctant to submit to the residue test because he had the right to remain silent, but he submitted when he was told he had no choice. In summary, he said he never aimed the gun at anyone, he only fired three shots in order to scare off the attackers, and he acted in self-defense because he was getting hit so many times that he was scared for his life and Melinda's life.
On cross-examination, he denied using alcohol on the day of the incident although he admitted he had used alcohol previously. He was certain that he had no alcohol on the 27th or on the 28th. He conceded that he did not like his mother's boyfriend who was an alcoholic and beat her up. Further, he said that when he went up to the gate, he saw someone had Melinda by the hair and noticed the dog biting Melinda's leg. When he kicked open the gate, the dog came running at him and grabbed him on the left pant leg so he fired once at the ground toward the dog. He went in and grabbed Melinda. He never saw Denise at all. He said the shooting of the gun was not as a result of anger but it was strictly out of fear. He pitched the gun but kept looking over his shoulder out of fear that someone may have been chasing them. At Metro General Hospital, he did not want to tell the nurse too much information because he was afraid she would tell the police. He did not recall that he said he had alcohol earlier in the evening but, in fact, told the nurse that he had not had alcohol that evening; further, he did not recall making the statement that he wanted to speak to his lawyer.
The defense rested and renewed its motion for acquittal pursuant to Crim.R. 29 which was denied.
The jury found appellant not guilty of felonious assault as charged in count one as to Roger Gandee, but guilty of the lesser but included offense of aggravated assault, and guilty of felonious assault of Robert Gandee, Jr. as charged in count two of the indictment. Each of the guilty verdicts was returned with a violence and firearm specification. The jury found appellant not guilty of felonious assault of Denise Siebert, as charged in count four, and the jury was unable to reach a verdict on count three of the indictment which charged appellant with felonious assault of James Gandee. On April 3, 1996, appellant was sentenced to a term of imprisonment of three years actual incarceration on each of the gun specifications in counts one and two merged to count one, to be served consecutively and prior to the sentence of three to five years as imposed on count one and eight to fifteen years as imposed on count two, to be served consecutive to each other. These convictions were appealed inState v. Bourdess (June 9, 1997) Cuyahoga App. No. 70541, unreported, which was dismissed upon the finding that this court lacked jurisdiction due to the trial court's failure to enter a final determination of count three of the indictment. Subsequently, the trial court dismissed count three of the indictment with prejudice and this appeal follows in which appellant advances three assignments of error for our review.
 I. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR BY ALLOWING THE PROSECUTOR TO IMPEACH HIS OWN WITNESS WITHOUT FIRST REQUIRING THE STATE TO PROVE THAT IT HAD BEEN SURPRISED BY THIS TESTIMONY, IN VIOLATION OF EVID.R. 607.
 II. THE TRIAL COURT COMMITTED PLAN (SIC) ERROR BY ALLOWING THE PROSECUTOR TO USE MEDICAL RECORDS OF THE DEFENDANT AND A DEFENSE WITNESS ON CROSS-EXAMINATION AND TO ALLOW THE MEDICAL RECORDS TO BE INTRODUCED INTO EVIDENCE WHEN THE RECORDS WERE OBTAINED IN VIOLATION OF THE PHYSICIAN-PATIENT PRIVILEGE AS SET FORTH IN R.C. § 2317.02 (B).
 III. THE CUMULATIVE EFFECT OF NUMEROUS VIOLATIONS OF THE RULES OF EVIDENCE DEPRIVED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
Appellant argues in his first assignment of error that the state improperly called Melinda Taulbee as a witness for the sole purpose of admitting into evidence a mediation report to impeach her without making a demonstration of surprise and affirmative damage to their case as required by Evid.R. 607 and that such improper use of the prior statement cannot be deemed to be harmless error. The state, on the other hand, maintains that Melinda Taulbee testified as a "court witness" upon recall and in reliance on State v. Rhym (July 27, 1995), Cuyahoga App. No. 67750, unreported, asserts that a demonstration of surprise and affirmative damage was not required for impeachment of the witness with a prior statement. Upon careful review of the record, although we find the state's reliance on Rhym to be misplaced, we find appellant's assertions to be without merit.
The colloquy between counsel and the court during which defense counsel objected to Melinda Taulbee being recalled and reasserted his objection to her being called as a court's witness reveals that the court upon recalling Miss Taulbee, specifically stated that she was recalled as a state's witness.
 Mr. Thomas: For the purpose of recalling her, it is the state's intention to again make a motion to recall her as a court's Witness, not as the state's witness, for the purpose of having her on cross-examination.
* * *
 Mr. Drucker: It's the defendant's position that Miss Taulbee started as a state's witness and the State should not be permitted to reopen the case and recall.
Mr. Thomas: I haven't closed my case.
 Mr. Drucker: Well, recall Melinda Taulbee for the purpose of impeaching their own witness. Number one, I object that — I objected in the beginning that she be declared a court's witness. However, Mr. Thomas was given a full opportunity to cross-examine her over my objections and now he's attempting to recall her in order to try to impeach her again, and it's not fair to the defendant. We are objecting to it.
 Mr. Thomas: Okay. My response to it is that as far as the events of yesterday is concerned that is a correct statement. The mediation history report, which was delivered to me today, was not known to the State yesterday. It was delivered by Detective Hace to me this a.m. when he arrived for court. It's a new development. I presented it to the Court as such. It's ultimately within the Court's discretion to allow the State to recall a witness within its own case.
* * *
 The Court: Good morning ladies and gentlemen. Step forward, ma'am, and take the stand again, okay? You are being recalled as a witness by the State.
 Mr. Thomas: Your honor, at this time the State recalls the Court's witness, Melinda Taulbee. Thank you.
(Emphasis added.)
Thus, we conclude from the record before us that Melinda Taulbee was recalled as the state's witness requiring a demonstration of both surprise and affirmative damage before impeachment with a prior statement pursuant to Evid.R. 607.
We are asked to determine whether the trial court abused its discretion and committed reversible error where it permitted the state to impeach its own witness with her prior out of court statement, the mediation report, which was inconsistent with her testimony at trial.
Evid.R. 607 provides:
 (A) Who May Impeach. The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid.R. 801 (D) (1) (a), 801 (D) (2), or 803.
Under Evid.R. 607, a party may not impeach its own witness with a prior inconsistent statement without showing surprise and affirmative damage. State v. Keenan (1993), 66 Ohio St.3d 402. Therefore, before a party may impeach its own witness Evid.R. 607 requires the party to demonstrate both "surprise" and affirmative damage.
In State v. Reed (1981), 65 Ohio St.2d 117, 125, the court stated that surprise is demonstrated when the testimony is not in accord with the prior statement and counsel did not have reason to believe the witness would repudiate the prior statement when testifying. "Surprise" under Evid.R. 607 is adequately demonstrated if the testimony is materially inconsistent with the prior statement and counsel did not have reason to believe the witness would change his testimony. State v. Blair (1987),34 Ohio App.3d 6. The requisite surprise can be established if the testimony is materially inconsistent with prior written or oral statements and counsel for the party calling the witness did not have reason to believe that the witness would recant when called to testify. Dayton v. Combs (1993), 94 Ohio App.3d 291. Under Evid.R. 607, the issue of surprise is a factual one, and the decision as to whether a party is taken by surprise is entrusted to the sound discretion of the trial court. State v. Blair,supra; Ferguson Realtors v. Butts (1987), 37 Ohio App.3d 30.
"Affirmative damage," under Evid.R. 607, is established when the witness testifies to facts which contradict, deny or harm the party's trial position. State v. Blair, supra. Affirmative damage will be established only if the witness testifies to facts which contradict, deny, or otherwise harm the calling party's theory of the case or trial posture. Id. Whether counsel was surprised is generally a question for the discretion of the trial court.Ferguson Realtors, supra at 33.
The Staff Note to Evid.R. 607 provides that both surprise and affirmative damage are required to be demonstrated before impeachment of one's own witness is permitted because:
 * * * [o]therwise, the party would be entitled to call a known adverse witness simply for the purpose of getting a prior inconsistent statement into evidence by way of impeachment, thus doing indirectly what he could not have done directly.
In this case, the record demonstrates that Melinda Taulbee's trial testimony indicated that during her altercation with Denise Siebert she was attacked and bitten by Denise Siebert's dog. The state sought to impeach this "surprise" testimony with the mediation statement made by Ms. Taulbee, wherein although she had described the details of the altercation which took place that night, the statement contained no mention that Melinda Taulbee was attacked and bitten by the dog.
Miss Taulbee's trial testimony concerning the attack by Denise Siebert's dog can be said to be materially inconsistent with the descriptive statement contained in the mediation report which makes no mention of the dog attack. Further, the record clearly demonstrates that Ms. Taulbee failed to cooperate with the prosecutor before trial and failed to discuss the substance of her testimony with him prior to trial thereby preventing the state from knowing what her testimony would be. Thus, the state had no reason to believe that this witness would testify at trial that she was attacked by a dog during the altercation. Under these circumstances, we find sufficient evidence in the record to support the conclusion that the state was "surprised" by Ms. Taulbee's testimony at trial that during the altercation she was attacked by Denise Siebert's dog.
Affirmative damage to the state's case occurs where the witness testifies to a fact which harms its position. Here, the state sought to prove appellant was guilty of felonious assault with a firearm. Appellant, however, sought to prove his innocence of the charges against him by demonstrating that he fired the gun in self-defense and in defense of Melinda Taulbee, claiming he was in fear for both his own life and the life of his girlfriend, Melinda Taulbee.
In this case, Denise Siebert testified that appellant took aim and shot at her during the altercation. Appellant, however, testified that he did not aim the gun at anyone that night but he, in fact, shot the gun at the ground near the attacking dog to effectuate an escape for himself and for Melinda. Thus, Melinda Taulbee's testimony asserting that she was being attacked by Denise Siebert's dog when appellant fired the gun is sufficient to cause affirmative damage to the state's case and to support appellant's position that his actions were taken in self-defense. Further, as evidence that this testimony did cause affirmative damage to the state's case, the jury found appellant not guilty of the charge of felonious assault as to Denise Siebert which was brought against him in count four of the indictment. Thus, we conclude that sufficient evidence exists in the record to support the conclusion that Melinda Taulbee's trial testimony regarding the attack by Denise Siebert's dog caused affirmative damage to the state's case of felonious assault as to Denise Siebert.
Accordingly, we find no abuse of the trial court's discretion when it permitted the state to impeach its own witness with a prior statement which was materially inconsistent with her trial testimony where sufficient evidence in the record exists to support the conclusion that the state was "surprised" by Melinda Taulbee's testimony and sufficient evidence in the record exists to support the conclusion that her trial testimony caused affirmative damage to the state's case. Appellant's first assignment of error is not well-taken.
In his second assigned error, appellant complains that the trial court committed plain error in permitting the prosecution to cross-examine both appellant and Melinda Taulbee with their medical records and to introduce the medical records into evidence in violation of the physician-patient privilege found in R.C. 2317.02 (B).
Initially we note that in Ohio, the patient is the holder of the physician-patient privilege. A person other than the patient cannot assert the privilege. Hunter v. Hawkes Hosp. of Mt. Carmel
(1989), 62 Ohio App.3d 155, 157. Thus, we find that appellant lacks standing to challenge the admission of Melinda Taulbee's medical records in this appeal.
R.C. 2317.02 (B) (1) provides that a physician may not testify "concerning a communication made to him by his patient in that relation * * *." R.C. 2317.02 (B) (3) broadly defines "communication" to include "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician * * * to diagnose, treat, prescribe, or act for a patient. A "communication" may include, but is not limited to, any * * * hospital communication such as a record * * *." Thus, information placed in hospital records by a physician is privileged. The term "communication" as defined by R.C. 2317.02 (B) (4) (a) is sufficiently broad to encompass a patient's communication with a nurse performing duties to assist a physician in the diagnosis and treatment of a patient. Johnston v. Miami Valley Hosp. (1989), 61 Ohio App.3d 81,84-85; State v. Wells (Dec. 21, 1994), Hamilton App. No. C-940307, unreported; State v. Kabeller (Dec. 20, 1990), Franklin App. No. 90AP-53, unreported. See, also, State v. Gabriel (1991),72 Ohio App.3d 825, 829. The evidentiary privilege of R.C.2317.02 (B) extends to hospital records containing privileged communications. State v. McKinnon (1987), 38 Ohio App.3d 28.
Accordingly, we find appellant's hospital records containing the nurse's notes and observations were privileged. R.C. 2317.02. The admission of the privileged records is error. See State v.Webb (1994), 70 Ohio St.3d 325, 334, certiorari denied (1995);Weis v. Weis (1947), 147 Ohio St. 416, paragraph five of the syllabus; State v. Napier (Aug. 28, 1998), Hamilton County App. No. C-970383, unreported.
In State v. Webb, supra, our Supreme Court affirmed the conclusions of the court of appeals which found that the introduction of Webb's hospital records to show that his injuries disproved his trial testimony was a violation of the doctor-patient statute, R.C. 2317.02 (B), but found the error to be harmless.
In this case the record demonstrates that on cross-examination the state, without objection, used appellant's privileged medical records to impeach his credibility. However, without objection, the error asserted by appellant was waived. See State v.Cherukuri (1992), 79 Ohio App.3d 228. Nonetheless, under Crim.R. 52 (B), we have discretion to recognize "plain errors or defects affecting substantial rights * * * although they were not brought to the attention of the court." Notice of plain error under Crim.R. 52 (B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. Thus, an alleged error "does not constitute a plain error or defect under Crim.R. 52 (B) unless, but for the error, the outcome of the trial clearly would have been otherwise." Id., paragraph two of the syllabus. Therefore, we are asked to determine whether the error in the admission and the use of appellant's medical records to impeach him constituted plain error.
Civ.R. 52 (A) provides that any error that "does not affect substantial rights shall be disregarded." The plain error standard requires this court to determine whether, but for the error, the outcome of the trial would have been different. Errors involving privilege are not constitutional violations. Webb,supra at 334-335. Non-constitutional error is harmless if there is substantial other evidence to support the guilty verdict. SeeState v. Davis (1975), 44 Ohio App.2d 335, 346-348, 73 O.O.2d 395, 401-402, citing State v. Cowans (1967), 10 Ohio St.2d 96,104. See, also, State v. Diehl (1981), 67 Ohio St.2d 389, 399, (Stephenson, J., dissenting); State v. Nichols (1993), 85 Ohio App.3d 65,73, fn. 6.
At trial, the state desired to diminish appellant's credibility as to his version of the events by showing the inconsistency of his trial testimony in which he stated he consumed no alcohol on the night of the incident and the hospital record which indicates he admitted to consuming alcohol and he smelled of alcohol.
This case turned on the credibility of the witnesses because the state sought to prove that appellant was guilty of felonious assault on each of the Gandee brothers and Denise Siebert and appellant sought to demonstrate that he fired the gun that night only in self-defense.
To successfully assert the affirmative defense of self-defense the defendant must prove the following elements: (1) the defendant was not at fault in creating the situation giving rise to the incident; (2) the defendant had an honest belief that he was in imminent danger of death or great bodily harm that could only be escaped by a resort to the use of deadly force; and (3) the defendant had no ability to retreat or avoid danger. State v.Jackson (1986), 22 Ohio St.3d 281, 283.
The record demonstrates that even though the state erred in attacking appellant's credibility with his privileged medical records, the jury verdicts reveal that the jury must have found much of appellant's testimony to be credible. We find that this is so because although the jury found appellant guilty of the crime of felonious assault as to Junior Gandee, they found him guilty of the lesser included offense of aggravated assault of Roger Gandee, not guilty of the charges as to Denise Siebert, and were unable to reach a decision as to Jimmy Gandee.
Therefore, we conclude that although impeachment of appellant using his medical records was error, the record demonstrates that even with this error, the jury found some of appellant's testimony to be credible. Further, the other admissible evidence supported the jury's verdicts. See Webb, supra at 335; State v.Gabriel (1991), 72 Ohio App.3d 825, 830.
Consequently, we hold that the error was harmless, as we do not see that but for this error the outcome of the trial would have been different. We find that the error of the trial court in permitting the state to impeach appellant with his privileged medical records does not, under the circumstances of this case, rise to the level of plain error. Appellant's second assignment of error is without merit.
In his third assignment of error, appellant complains that the cumulative effect of the violations of the rules of evidence deprived him of a fair trial. Specifically, appellant claims that the testimony of the victims' mother, Jean Gandee, the display of the victims' scars, and a hearsay statement testified to by Det. Hace in which Melinda Taulbee referred to appellant as her "ex-boyfriend" collectively are so prejudicial as to require reversal of his convictions pursuant to State v. DeMarco (1987),31 Ohio St.3d 191. We do not agree.
The admission or exclusion of evidence rests with the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173. In order to find an abuse of that discretion, we must determine whether the trial court's decision to admit or exclude the evidence was arbitrary, unreasonable or unconscionable and not merely an error of judgment. State v. Xie (1992),62 Ohio St.3d 521.
The record demonstrates that although appellant objected to Jean Gandee's entire trial testimony as irrelevant, the court permitted her to testify. We do not find the decision of the court to have been so arbitrary, unreasonable or unconscionable as to constitute error where the challenged testimony merely gave her version of the events which transpired after the shooting and described the drug and prostitution problems of the neighborhood. Thus, we find no abuse of the court's discretion in the admission of Jean Gandee's testimony.
The record further demonstrates that, over objection, the court permitted Roger and Junior Gandee to display their scars to the jury. We cannot conclude that the court's allowance of the display of these injuries amounted to an abuse of its discretion where each of these shooting victims testified to the seriousness of the injuries sustained, the victims' medical records were entered into evidence and appellant did not deny shooting the gun which caused the injuries. Thus, we find no error in this evidentiary admission.
Finally, appellant complains that the trial testimony of Det. Hace included a hearsay statement which should not have been admitted under Evid.R. 802. The record demonstrates that at trial Det. Hace stated, without objection being entered by defense counsel, that during his oral interview of Melinda Taulbee, "* * * she indicated that [appellant] was her ex-boyfriend." Failure of counsel to object waives the error for our review on appeal.
Therefore, we find no error among the examples of alleged evidentiary errors put forth by appellant to support his assertion that the cumulative effect of errors requires reversal.
Appellant's third assignment of error is not well taken.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Ples Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PORTER, A.J. and SPELLACY, J., CONCUR.
 __________________________________ TIMOTHY E. McMONAGLE JUDGE